Christine D. PERSICO, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. 04–CV–3816 (RJD).

United States District Court,
E.D. New York.

March 6, 2006.

Aba Heiman, Fusco, Brandenstein & Rada, PC, Woodbury, NY, for Plaintiff.

Kathleen Anne Mahoney, Assistant U.S. Attorney, Leslie A. Ramirez–Fisher, Special Assistant U.S. Attorney, United States Attorney's Office, Brooklyn, NY, for Defendant.

## MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiff Christine D. Persico seeks review pursuant to 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security denying her disability benefits for the period of September 21, 1995, to December 1998. Plaintiff began working again part-time in December 1998, thereby closing the period of disability for which she seeks benefits. Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Commissioner now moves for judgment on the plead-

ings, affirming her determination that plaintiff was able to perform her past relevant work during the period in question. Plaintiff cross-moves for judgment on the pleadings, seeking reversal of the Commissioner's decision. For the reasons discussed below, the Commissioner's motion for judgment on the pleadings is denied and the case is remanded for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on March 4, 1996, alleging that she had been disabled since September 21, 1995. Tr. 30–32. The application was initially denied, and denied again upon reconsideration. Tr. 33, 52–55, 57–59. Plaintiff then requested a hearing, which was held before ALJ Leonard E. Ryan on January 26, 1998. Tr. 60, 821–67. On October 13, 1998, ALJ Ryan found that plaintiff was not disabled as defined by the Social Security Act and was therefore not entitled to disability benefits. Tr. 644–56.

On October 26, 1998, plaintiff requested review of ALJ Ryan's decision on the grounds that evidence was entered into the record subsequent to the hearing without affording plaintiff the opportunity to object or comment. Tr. 657–58. On July 28, 2000, the Appeals Council granted plaintiff's request for review. Tr. 682–84.

On October 25, 2000, ALJ Ryan disclosed the evidence in question to plaintiff's attorney. Tr. 704–05. Plaintiff testified at a second hearing in front of ALJ Ryan on March 2, 2001. Tr. 799–820. On April 18, 2001, ALJ Ryan again found that plaintiff was not disabled during the period in question because she was able to perform her past relevant work and, alternatively, she was able to perform other sedentary work. Tr. 17–29. ALJ Ryan's decision became final when the Appeals Council denied plaintiff's request for re-

view on August 18, 2004. Tr. 4–6. Plaintiff timely commenced this action.

## BACKGROUND

### A. Plaintiff's Age, Education, and Work Experience

Plaintiff was born on November 28, 1964, making her thirty at the onset of her alleged period of disability. Tr. 30, 686, 809. As of the date of her application, she had obtained a general equivalency diploma and attended approximately two years of college. Tr. 67, 809, 825. Plaintiff has also taken classes in legal shorthand, and continued to attend college part-time during her alleged period of disability, ultimately obtaining a degree in nursing from the College of Staten Island in January 2000. Tr. 803, 806, 832–33, 844.

Plaintiff worked as a secretary from 1984 through 1995, the last nine years of this period for the same law firm. Tr. 67. At the law firm, plaintiff began as a receptionist and was ultimately promoted to a position as a legal secretary for a senior partner. Tr. 67, 825, 841–45. Plaintiff began to experience symptoms of Chronic Fatigue Syndrome ("CFS") in November 1994, and these symptoms began to affect her work. Tr. 837. Around July 1995, she was reassigned to the "floating staff." *Id.* Plaintiff stopped working at the law firm in September 1995. *Id.*

Plaintiff began working again part-time as a hostess in a restaurant in December 1998. Tr. 721. From September 1999 through March 2000, plaintiff worked thirteen hours per week performing general clerical duties at a bus company. *Id.* Plaintiff stopped working at the bus company to study for her nursing exam and, after earning her degree, began working as a registered nurse at Maimonides Medical Center in Brooklyn in July 2000. Tr. 789, 803.

### B. Medical Evidence

1. *Treating Physician Konstantinos Koutelos, M.D.*

Plaintiff first saw Dr. Koutelos on November 14, 1994, complaining of anxiety, dizziness, fatigue, and tingling in her arms and legs. Tr. 461. Dr. Koutelos diagnosed "anxiety hyperventilation syndrome," prescribed Buspar for her anxiety, and ordered routine lab work. *Id.* Dr. Koutelos thereafter found that plaintiff suffered from hypothyroidism and prescribed Synthroid. Tr. 462–63, 827. On December 22, 1994, Dr. Koutelos noted that plaintiff's fatigue had lessened. Tr. 463, 465.

In response to plaintiffs complaints of hematuria (blood in the urine), Dr. Koutelos ordered a renal ultrasound on December 22, 1994. Tr. 463. The ultrasound was performed on December 26, and the results were negative. Tr. 486.

On January 6, 1995, Dr. Koutelos noted again that plaintiff's fatigue had improved, but diagnosed plaintiff with bronchitis. Tr. 465. Dr. Koutelos prescribed an antibiotic and an antihistamine for the bronchitis and ordered further laboratory tests for the hematuria. *Id.*

On January 13, 1995, Dr. Koutelos ordered a cystoscopy for further evaluation of the hematuria. Tr. 464. The cystoscopy revealed a normal bladder. Tr. 464. Plaintiff again complained of fatigue on February 15, 1995, and Dr. Koutelos ordered additional blood work. Tr. 468. Later in 1995, Dr. Koutelos noted that plaintiff's fatigue could be the result of Epstein–Barr virus or sleep apnea, and continued to prescribe Synthroid for hypothyroidism. Tr. 467. On April 21, 1995, plaintiff's urinalysis showed no evidence of hematuria. Tr. 196.

On July 20, 1995, Dr. Koutelos noted that plaintiff had benign hematuria, contin-ued to prescribe Synthroid for plaintiff's hypothyroidism, and advised plaintiff to lose weight and walk to try to alleviate her fatigue. Tr. 470. On September 11, 1995, Dr. Koutelos again advised exercise, but also noted plaintiff's muscle aches. He ordered tests for Lyme disease and Epstein–Barr. *Id.* On September 14, 1995, plaintiff tested negative for Lyme disease and positive for Epstein–Barr. Tr. 198–99.

After seeking a second opinion from Dr. Solis, plaintiff returned to Dr. Koutelos on October 19, 1995, claiming her health had improved since leaving work. Tr. 469. Dr. Koutelos noted improved sleep and ability to exercise, and restated his assessment of hypothyroidism. *Id.*

Plaintiff complained of anxiety attacks to Dr. Koutelos on December 29, 1995. Tr. 466. Dr. Koutelos's notes indicate that he was considering diagnoses of depression and fibromyalgia. *Id.* At this time, Dr. Koutelos recommended an anti-depressant. *Id.*

On February 16, 1996, Dr. Koutelos diagnosed anxiety and depression and noted plaintiff's positive test results for Epstein–Barr. Tr. 466.

On March 15, 1996, Dr. Koutelos completed a questionnaire for the New York State Office of Disability Determinations. Tr. 86–89. Dr. Koutelos noted that the plaintiff suffered from hypothyroidism and fatigue. Tr. 86. Plaintiff's symptoms were listed as fatigue and myalgia (muscle aches or pain). *Id.* Dr. Koutelos also noted that plaintiff had been prescribed Synthroid, displayed no symptoms of a significant psychiatric disorder, tested positive for Epstein–Barr, and suffered from fatigue all day that was greater in the afternoon. Tr. 87–88. Dr. Koutelos also stated that any depression suffered by plaintiff was secondary to fatigue. Tr. 88. Dr.

Koutelos noted no limitation to lifting and carrying, standing and walking, sitting, or pushing and pulling. Tr. 88–89.

In a June 5, 1996 letter to plaintiff's private insurer, Dr. Koutelos stated that plaintiff had been under his care since November 14, 1994, for hypothyroidism. Tr. 458. Dr. Koutelos also noted that plaintiff declined antidepressants, and that this might be contributing to her fatigue. *Id.* He also noted patient's recurring muscle pain and poor quality sleep. *Id.* Dr. Koutelos recommended consultation with a psychiatrist and a rheumatologist, and noted that plaintiff said she was unable to work secondary to her fatigue. *Id.*

### 2. *Treating Physician Roberto Solis, M.D.*

On September 19, 1995, plaintiff sought a second opinion from Dr. Solis, who noted plaintiff's symptoms as muscle pain, headaches that limited her ability to concentrate, and skin rash. Tr. 96–101, 828. Dr. Solis also noted plaintiff's positive Epstein–Barr, and for the first time in plaintiff's medical treatment suggested that she might be suffering from Chronic Fatigue Syndrome. Tr. 97, 99, 828.

On October 3, 1995, Dr. Solis again noted that plaintiff's symptoms were consistent with CFS. Tr. 150.

On January 11, 1996, plaintiff complained of stiffness, weakness, headaches, and insomnia to Dr. Solis. Tr. 100, 151. Dr. Solis prescribed Buspar, which had also been prescribed by Dr. Koutelos. *Id.*

Plaintiff complained of fatigue, rash, trouble sleeping, and tiredness to Dr. Solis on February 20, 1996. Tr. 101. Dr. Solis diagnosed CFS and continued Buspar. *Id.*

On March 21, 1996, plaintiff's lab tests were again positive for Epstein–Barr virus. Tr. 94–95.

On March 28, 1996, Dr. Solis completed a questionnaire for plaintiff's private disability benefits carrier, on which he listed his diagnosis of CFS. Tr. 146–47. Dr. Solis noted plaintiff's symptoms as headaches, lethargy, myalgia, rash, sore throats, and anxiety. Objective findings consisted of positive Epstein–Barr virus titers, rash, tender joints, and muscle aches. Tr. 146.

On March 29, 1996, Dr. Solis completed a medical questionnaire in connection with plaintiff's Social Security disability claim on which he diagnosed CFS and Epstein–Barr virus. Tr. 90–93. Plaintiff's symptoms were headache, lethargy, myalgia, joint stiffness, fatigue, weakness, and rash. Tr. 90. Dr. Solis noted that he had prescribed Buspar and that he had not observed any behavior suggestive of a psychiatric condition. Tr. 91. In response to a request to describe any clinical findings "such as any loss of motion in degrees . . . , site and severity of any neurological defects, any organ enlargement, and other abnormalities," Dr. Solis listed nothing. Tr. 91. Laboratory findings consisted of positive tests for Epstein–Barr. Tr. 92. Dr. Solis noted constant fatigue and depression that was secondary to fatigue. *Id.* Contrary to Dr. Koutelos's answers to the same questionnaire two weeks earlier, Dr. Solis stated that plaintiff could not lift and carry anything, her ability to stand and walk was limited to less than two hours per day, she could not sit for more than six hours per day, and her ability to push and pull was limited. Tr. 92–93. Dr. Solis also noted a lack of concentration, headaches, and anxiety. *Id.*

Dr. Solis saw plaintiff again on July 1, 1996 and noted a negative lab result for HIV. Tr. 153. He continued Synthroid and Buspar. *Id.* Dr. Solis diagnosed CFS and anxiety. *Id.*

On December 26, 1996, Dr. Solis examined plaintiff and noted that she had CFS and an upper respiratory infection. Tr. 156. Dr. Solis continued to prescribe Buspar. *Id.*

In a letter dated June 30, 1997, Dr. Solis states that plaintiff had to withdraw from three classes due to CFS. Tr. 123. Dr. Solis's examination notes from this date indicate that plaintiff was suffering from chronic fatigue, myalgia, and gastroesophageal reflux disease. Tr. 157.

In an August 7, 1997 letter to plaintiff's private insurer, Dr. Solis restated his diagnosis of CFS, and recommended that plaintiff's private disability payments be reinstated. Tr. 121–22.

Dr. Solis noted on December 16, 1997, that plaintiff had been off Buspar for two to three months. Tr. 158.

3. *Treating Physician and CFS Specialist Susan M. Levine, M.D.*

Plaintiff began seeing Dr. Levine, a CFS specialist, in March of 1996. *See* Tr. 102. Dr. Levine noted plaintiff's symptoms as "severe exhaustion; low-grade fevers; night sweats; muscle aches in the shoulders and back; dizziness; headaches; difficulty with short-term memory and concentration; and weight gain," Tr. 102. Dr. Levine noted that these symptoms had worsened in the past year, and that plaintiff "became disabled in early 1995." *Id.* As a result of these symptoms, Dr. Levine stated that plaintiff could not lift and carry more than ten pounds, she could stand and walk for less than two hours per day, she could sit for less than six hours per day, and her ability to push and pull was limited as well. Tr. 104–05. Dr. Levine's physical examination showed red throat; enlarged cervical lymph nodes; non-palpable thyroid; a normal chest, heart, and lung exam; mild abdominal distention; 4/5 motor strength in the lower extremities;

deconditioning in plaintiff's limbs; the inability to count backwards serial 7's more than four sequences; positive testing for previous exposure to Herpes Virus VI, which is "thought to be causative of CFS"; and low calcium and chromium levels. Tr. 102. Dr. Levine prescribed the antiviral drug Amantadine and bed rest. *Id.* Dr. Levine recommended that the plaintiff be found totally and permanently disabled. Tr. 102–03.

In a report to plaintiff's attorney dated April 29, 1996, Dr. Levine described her examination of plaintiff on April 24, 1996. Tr. 108–108A. Dr. Levine noted that plaintiff had 5/5 motor strength in her upper extremities and 4/5 motor strength in her lower extremities and a limited range of motion in her hips. Tr. 108A. Dr. Levine also noted erythema with a red arc at the back of plaintiff's throat, and a slightly enlarged thyroid and lymph glands. *Id.* It was Dr. Levine's recommendation, "[b]ased on [her] wide experience in treating over 2,500 patients with CFS," that plaintiff be granted total disability. *Id.* Dr. Levine stated that patients who have been ill for as long as plaintiff are unlikely to recover, and that plaintiff should be granted "total and permanent disability." *Id.*

In a letter to plaintiff's private disability insurer dated May 20, 1996, Dr. Levine noted that plaintiff could not stand, walk, or lift for more than fifteen minutes at a time, and that visiting friends, cooking, light cleaning, and household chores were out of the question due to plaintiff's severe exhaustion. Tr. 512. Dr. Levine stated that plaintiff was incapable of even low-stress, sedentary work. *Id.* Dr. Levine restated her opinion that plaintiff was "totally disabled" and would remain so for an indeterminate period of time. *Id.*

Plaintiff saw Dr. Levine on June 20, 1996 complaining of severe exhaustion, low-grade fevers, night sweats, difficulty concentrating, recurring muscle and joint aches, gastrointestinal disturbances, nausea and vomiting, the need to sleep for long periods of the day, and dizziness. Tr. 384. Dr. Levine restated her diagnosis of CFS and prescribed bed rest and vitamin B–12. *Id.*

Plaintiff again saw Dr. Levine on August 28, 1996. Tr. 384. In addition to restating her previous symptoms, plaintiff complained of intermittent cognitive disturbances, the inability to read for long periods of time, difficulty remembering, and rashes. *Id.* Plaintiff's throat was red and she had enlarged cervical lymph nodes. *Id.* Dr. Levine advised plaintiff to continue bed rest. *Id.*

In a letter to plaintiff's private insurance carrier dated October 10, 1996, Dr. Levine reported that plaintiff could stand for only fifteen minutes at a time three times per day with frequent rest periods; she could walk, climb stairs, lift and carry packages weighing more than ten pounds, crawl, climb, bend, or kneel for more than ten minutes no more than three times per day. Tr. 383. Plaintiff's fatigue, which was precipitated by any kind of physical or emotional stress, is noted as the cause of these restrictions. *Id.*

On December 2, 1996, Sallyann Kelley–Brophy, a registered nurse at plaintiff's private disability insurance carrier, wrote to Dr. Levine. Tr. 354–55. Ms. Kelley–Brophy indicated that plaintiff had refused Dr. Koutelos's recommendation of anti-depressants, and informed Dr. Levine that, contrary to Dr. Levine's assessment of plaintiff's abilities, plaintiff had been observed walking multiple city blocks carrying a small child. Tr. 354. In a December 6, 1996, response to Ms. Kelley–Brophy's letter, Dr. Levine stated that psychological counseling probably would not help the plaintiff's condition, that plaintiff was not capable of even a graded exercise program, and that she did not believe plaintiff was psychologically impaired. Tr. 306.

Ms. Kelley–Brophy again wrote to Dr. Levine on May 28, 1997, and stated that Dr. Levine's assessment that plaintiff was totally disabled was contradicted by her attending college classes and carrying a small child several city blocks. Tr. 304–35. Ms. Kelley–Brophy further suggested that plaintiff had not been completely honest with Dr. Levine and that Dr. Levine did not see plaintiff often enough to support her assessment of disability. *Id.* In a letter dated June 6, 1997, Dr. Levine replied, "Perhaps I don't have enough knowledge of this patient's activities to conclude one way or another whether she is capable of returning to work." Tr. 302. Dr. Levine further stated that she would "defer to [Ms. Kelley–Brophy's] judgment in this situation." *Id.*

Plaintiff next saw Dr. Levine on July 11, 1997, and reported feeling weak, tired, and run-down. Tr. 131. Plaintiff also complained of low-grade fevers, night sweats, muscle and joint aches, difficulty concentrating, headaches, and sinus congestion. *Id.* Plaintiff had a red throat. *Id.* Dr. Levine continued to assess CFS, advised bed rest, and was considering prescribing Kutapressin. *Id.*

In another letter to plaintiff's private insurer dated July 22, 1997, Dr. Levine recommended that plaintiff's insurance payments be reinstated. Tr. 124. While acknowledging that plaintiff "had attempted to attend some part-time courses," Dr. Levine stated that plaintiff "was forced to withdraw from 1994 to 1997" due to her illness. *Id.* Dr. Levine concluded that plaintiff was "incapable of even sedentary, stress-free work." *Id.*

### 4. State–Appointed Consultative Psychiatrist Juan Fiks, M.D.

Dr. Juan Fiks conducted a psychiatric examination of plaintiff on behalf of the New York State Bureau of Disability Determinations on April 19, 1996. Tr. 106–07. Dr. Fiks noted that plaintiff said she had Epstein–Barr but that she was out of the acute stage. Tr. 106. Dr. Fiks also noted plaintiff's complaints of fatigue, anxiety, trouble sleeping, fevers and chills, and tension headaches. Tr. 106–07. As to her mental state, Dr. Fiks noted that plaintiff was anxious and "ha[d] the equivalence of depression." Tr. 106. Plaintiff was observed as being in no physical distress, clean and well presented, of appropriate affect and adequate insight and judgment, and of average to above average intelligence. Tr. 106–07. Dr. Fiks noted a diagnostic impression of anxiety disorder. Tr. 107.

### 5. Independent Medical Examiner Todd E. Feinberg, M.D.

On January 16, 1997, Dr. Feinberg conducted a neurobehavioral examination of plaintiff at the request of her private disability insurance provider. Tr. 332–39. In addition to examining plaintiff, Dr. Feinberg reviewed the medical reports of Drs. Solis, Koutelos, and Levine. Tr. 333–34. Plaintiff told Dr. Feinberg that she " 'doesn't do much of anything,' " that her appetite was " 'not so much,' " her sleep was variable, and that she did not have a persistent blue mood. Tr. 334. Plaintiff also told Dr. Feinberg that she was unable to do any labor, and that she was unable to walk, carry things, or sit for an extended period of time. Tr. 334. Dr. Feinberg found no evidence of psychopathology and he could not affirm or deny Dr. Solis's and Dr. Levine's diagnosis of CFS, which Dr. Feinberg characterized as "a controversial diagnosis." Tr. 336. However, Dr. Fein-

berg described plaintiff as "totally disabled" because of CFS, and noted that plaintiff is only able to engage in limited stress situations and limited interpersonal limitations. Tr. 337. Dr. Feinberg assessed that plaintiff could lift one to ten pounds only 33% of the time, that she had no "power grip," that she could not use feet for repetitive movements operating foot controls, and that the Buspar could be contributing to plaintiff's dizziness, fatigue, nausea, and headaches. Tr. 338–39.

### 6. Other Medical Evidence

#### Urologist Jeffrey Gordon, M.D.

At the request of Dr. Solis, Dr. Gordon examined plaintiff for her asymptomatic hematuria on May 1, 1996. Tr. 184, 219. Dr. Gordon noted that the physical examination was unremarkable, that urinalysis revealed 10–15 red blood cells per high powered field with bacteriuria present, and that he would like to see plaintiff's old x-rays and medical records to make a more complete assessment. Tr. 184. Dr. Gordon's impression was that plaintiff had asymptomatic micro-hematuria. *Id.*

#### Neurologist Arun Nangia, M.D.

Also at the request of Dr. Solis, plaintiff saw Dr. Nangia on July 30, 1997, for complaints of "sudden, uncontrollable movement of the left mostly to the right side followed by feeling of hot inside the head and pain and soreness at the back of the neck and the head but not radiating down her shoulder or upper extremity." Tr. 216. Plaintiff had suffered three or four episodes already that year, and similar episodes had been occurring since childhood. *Id.* Dr. Nangia noted that plaintiff denied any motor weakness, fainting spells, or dizziness. *Id.* Dr. Nangia listed possible causes as complex partial seizure, vertobrasilar insufficiency/posterior circulation stroke, tempromandibular joint dysfunction, or cervical radiculopathy. Tr.

217–18. Dr. Nangia recommended the plaintiff undergo more testing. Tr. 218.

*Neurologist Matthew J. DeLuca, M.D.*

Plaintiff saw another neurologist, Dr. DeLuca, on August 11, 1997, for the "episodes of heat-like sensation" she had been having since childhood. Tr. 190–91. Dr. DeLuca noted similar symptoms to those noted by Dr. Nangia. *Id.* Dr. DeLuca also noted that plaintiff's muscle strength was 5/5. Tr. 191. Dr. DeLuca's impression was that plaintiff suffered from transient brainstem ischemia, which occurs from compression of the vertebral artery during head movements. *Id.* Dr. DeLuca also recommended further testing. *Id.*

### C. Plaintiff's Testimony

Plaintiff first testified in front of an ALJ at a hearing on January 26, 1998. *See* Tr. 821–67. Plaintiff described how, when she began to experience symptoms in late 1994, she went to see Dr. Koutelos. Tr. 826. Dr. Koutelos ran blood tests and plaintiff tested positive for a thyroid condition and Epstein–Barr. Tr. 826–27. Plaintiff acknowledged that her thyroid condition was successfully regulated by the Synthroid. Tr. 827.

Plaintiff stated that she began seeing Dr. Solis in September 1995 because she was still feeling "terrible." Tr. 828. Plaintiff testified that she had seen Dr. Solis "[e]very few months" since September 1995, and that Dr. Solis prescribed "pretty much all" of plaintiff's medications. Tr. 829.

Plaintiff testified that she saw Dr. Levine less often than she saw Dr. Solis. Tr. 829. Plaintiff at first could not recall whether Dr. Solis referred her to Dr. Levine, but then affirmed that Dr. Solis referred her to a CFS clinic that then referred her to Dr. Levine. Tr. 829–30. Plaintiff stated that she last saw Dr. Levine around July 1997. Tr. 830.

Plaintiff also testified about her school attendance during her alleged period of disability. Tr. 831. Despite the fact that she had been trained in shorthand, her illness made it difficult for her to take notes in class. Tr. 831–33, 835–36. Plaintiff testified that she had difficulty reading due to her illness, which forced her to withdraw from a biology class. Tr. 831. Plaintiff also was forced to withdraw from an Italian class, and took an incomplete in a math class due to her illness. Tr. 833, 834, 840. When asked whether she had completed any course work since September 1995, plaintiff replied that she had completed one course in nursing. Tr. 833. When she did attend classes, plaintiff was driven to and from school by her husband because her illness affected her reflexes and caused "star[ry] eyes." Tr. 836–37.

Plaintiff stopped working in September 1995 because she "was constantly exhausted" and "had pain just about everywhere." Tr. 841. Plaintiff's symptoms included rashes, loss of motor ability in the hands, and insomnia. Tr. 852, 857.

### DISCUSSION

■■■ The court reviews the Commissioner's findings only to determine whether they are "supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (inter-

nal quotation marks and citation omitted). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998) (citation omitted). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for plaintiff's position. *Jones v. Sullivan*, 949 F.2d 57, 59–60 (2d Cir.1991). The court "may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon a *de novo* review." *Id.* (internal quotation marks and citation omitted).

A claimant is eligible for disability benefits under the Social Security Act if her impairments are of such severity that she is "not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Social Security Administration follows a five-step procedure when evaluating whether a claimant is disabled:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir.1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982)); *see also* 20 C.F.R. § 404.1520(a)(4) (2005). Although the burden is on plaintiff to show that she is disabled, once she has shown that "[her] impairment renders [her] unable to perform [her] past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy that plaintiff could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir.1998) (internal quotations omitted) (citations omitted).

In this case, the ALJ found at Steps One and Two that plaintiff did not engage in substantial gainful activity during the alleged period of disability and that plaintiff had a severe impairment. Tr. 28. At Step Three, the ALJ found that none of plaintiff's impairments and no combination of plaintiff's impairments met or equaled the criteria of a listed impairment in Appendix 1, Subpart P. *Id.* The ALJ concluded at Step Four that plaintiff had the residual functional capacity ("RFC") to perform her past relevant work. *Id.* at 28–29. The ALJ also found the plaintiff capable of "the full range of sedentary work during the period under consideration" at Step Five. *Id.* at 28. Because he found that plaintiff had the RFC to perform her past relevant work and could have performed other work during the period in question, the ALJ concluded that plaintiff was not disabled.

## A. SSR 99–2p

Plaintiff first argues that the ALJ's decision is "based on an erroneous legal standard," *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir.1997), because the ALJ failed to apply Social Security Ruling 99–2p, 64 Fed.Reg. 23380 (April 30, 1999).[1] *See Green–Younger v. Barnhart*, 335 F.3d 99, 107–108 (2d Cir.2003) (holding that a decision denying benefits where the ALJ did not follow a relevant Social Security Administration Memorandum was based on "an erroneous legal standard"). SSR 99–2p defines CFS as "a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration, and severity [that is] characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities." 64 Fed. Reg. at 23381. According to the Ruling, CFS involves the concurrence of four or more of the following symptoms, all of which must have persisted or recurred during six or more consecutive months and none of which predated the fatigue:

(1) Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;

(2) Sore throat;

(3) Tender cervical or axillary lymph nodes;

(4) Muscle pain;

(5) Multi-joint pain without joint swelling or redness;

(6) Headaches of a new type, pattern, or severity;

(7) Unrefreshing sleep; and

(8) Postexertional malaise lasting more than 24 hours.

64 Fed.Reg. at 23381. The Commissioner also requires certain clinical findings to justify a finding of disability. SSR 99–2p, 64 Fed.Reg. at 23381–82; 20 C.F.R. § 404.1508. Under the Ruling, one or more of the following medical signs clinically documented over a period of at least six consecutive months establishes the existence of a medically determinable impairment for individuals with CFS:

(1) Palpably swollen or tender lymph nodes on physical examination;

(2) Nonexudative pharyngitis;

(3) Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points;

(4) Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

64 Fed.Reg. at 23382 (footnote omitted). SSR 99–2p also lists the following examples of laboratory findings that confirm the existence of CFS:

(1) An elevated antibody titer to Epstein–Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640;

(2) An abnormal magnetic resonance imaging (MRI) brain scan;

(3) Neurally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing; or

(4) Any other laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record; for example, an abnormal exercise stress

---

1. Social Security Rulings "represent precedent final opinions and orders and statements of policy and interpretations that [the Social Security Administration] has adopted." 20 C.F.R. § 402.35(b)(1) (2005). "They are binding on all components of the Social Security Administration ...." *Id.* § 402.35(b)(2).

test or abnormal sleep studies, appropriately evaluated and consistent with the other evidence in the case record.

*Id.* The Ruling also acknowledges that some individuals with CFS report ongoing problems with certain aspects of mental functioning. Therefore, when testing documents deficits in "short-term memory, information processing, visual-spatial difficulties, comprehension, concentration, speech, word-finding, calculation, and other symptoms suggesting persistent neurocognitive impairment, . . . such findings constitute medical signs or . . . laboratory findings that establish the presence of a medically determinable impairment." *Id.* Similarly, appropriately documented medical signs, such as "anxiety or depression, indicative of the existence of a mental disorder," will also establish the existence of a medically determinable impairment. *Id.* Once a medically determinable impairment has been established pursuant to SSR 99–2p, the five-step evaluation is conducted. *Id.*

■ The ALJ did not acknowledge medical findings and lab reports that establish CFS according to SSR 99–2p. For example, the ALJ states that Dr. Solis's and Dr. Levine's assessments of the plaintiff "are based merely on [plaintiff's] subjective reports of her limitations" and that "[n]o objective clinical evidence was cited before the physicians concluded that [plaintiff] was severely and 'permanently' disabled." Tr. 25. This is simply not true. Plaintiff twice tested positive for the Epstein–Barr virus and her doctors repeatedly noted muscle tenderness, both of which are listed in SSR 99–2p as signs or findings that establish CFS. Also, plaintiff was continually diagnosed as suffering from anxiety and was prescribed Buspar throughout her period of disability. "[A]ppropriately documented" anxiety is another objective indicator of CFS recognized by SSR 99–2p.

*See* 64 Fed.Reg. at 23382. Even if it were uncertain whether the ALJ's failure to properly identify this evidence constitutes reversible error, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987). As the Court finds that the ALJ failed to apply the correct legal principles to plaintiff's case, the decision of the Commissioner cannot be affirmed.

**B. Plaintiff's Credibility**

■ Plaintiff's second argument is that the ALJ's determination that plaintiff's statements were "not entirely credible" is not based on substantial evidence. Tr. 23. The ALJ based his credibility determination, first, on a report by an investigator for plaintiff's private insurer. *See* Tr. 25. The investigator observed plaintiff carrying a small child from a parked car into a hospital during her alleged period of disability. However, the ALJ ignored several aspects of the investigator's report that actually support a finding of disability. The investigator observed the plaintiff for nine days. On the other eight days, plaintiff did not leave her house. *See* Tr. 315–17, 359–67, 392–411. In total, plaintiff left her house for only a little more than two hours during the entire nine-day period. *See* Tr. 406–07. Even on the day she was observed carrying the child, she was driven to the hospital by someone else, which corroborates plaintiff's statement that she could not drive due to her illness. Tr. 406–07.

The ALJ also misstated exactly what was observed. The report states that

plaintiff was observed being driven to the hospital in a van and then carrying a child from the parked van into the hospital. Tr. 406–07. The ALJ wrote in his decision that the claimant was observed "walking several blocks from her home without any difficulty to the emergency room at Victory Memorial Hospital, carrying a small child in her arms." Tr. 25. The ALJ's statement implies that plaintiff walked from her home to the hospital when in fact she was driven by someone else, only walking from the parked car to the hospital.

The ALJ also based his credibility determination on the fact that plaintiff attended college classes during her alleged period of disability. *See* Tr. 25. However, the record is clear that plaintiff was forced to withdraw from many of these classes due to her illness. For example, plaintiff had difficulty reading due to her illness, which forced her to withdraw from a biology class. Tr. 831. Furthermore, even though plaintiff had been trained in shorthand while at the law firm, she recorded the lectures because her illness prevented her from taking notes. Tr. 831–33, 835–36. She was driven to and from class by her husband, which further corroborates plaintiff's testimony that CFS made her too sick to drive. Tr. 836–37. Moreover, the fact that plaintiff was, at some points during her alleged period of disability, able to shop, do dishes, perform self-care activities, and watch television should not foreclose a finding of disability due to CFS. SSR 99–2p specifically states that "[t]he medical signs and symptoms of CFS fluctuate in frequency and severity ...." 64 Fed.Reg. at 23383. According to SSR 99–2p, it is reasonable to assume that plaintiff would have good days and bad days, and that her abilities would fluctuate accordingly. Because a reasonable mind could not accept this evidence as adequate to support a finding that the plaintiff was not credible, *Richardson v. Perales*, 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), the Court finds that the ALJ's credibility determination is not based on substantial evidence. *See Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984) (holding that credibility findings must be supported by substantial evidence).

### C. Treating Physician Rule

■■■ Plaintiff argues that the ALJ improperly discounted the evidence and opinions of treating physicians Drs. Solis and Levine. The opinion of a treating physician is controlling if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] ... record." 20 C.F.R. § 404.1527(d)(2); SSR 99–2p, 64 Fed.Reg. at 23383; *see also Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003). The ALJ must provide "good reasons" for not assigning controlling weight to the treating physician's diagnosis. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999). When the treating physician's opinion is not given controlling weight, a number of factors are used to determine what weight the opinion deserves, including (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the evidence in support of the opinion, (4) the opinion's consistency with the record as a whole, and (5) whether the opinion is from a specialist. 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993).

■■■ The ALJ found the opinions of Drs. Solis and Levine neither well supported nor consistent with the other substantial evidence in the record. Tr. 25. However, as discussed above, the opinions

of Drs. Solis and Levine are supported by "medically acceptable clinical and laboratory diagnostic techniques," as required by SSR 99–2p. The Court also finds that these opinions are consistent with the other substantial evidence in the record. Much of the ALJ's decision was based on his finding that the plaintiff was not credible. The ALJ then uses this credibility determination to discount the opinions of Drs. Solis and Levine, stating that their opinions "are based merely on Ms. Persico's subjective reports of her limitations." Tr. 25. The ALJ reasoned that if the doctors' opinions were based solely on incredible statements, then the opinions should not control, nor should they be given much weight. However, as the Court finds that the ALJ's credibility determination was not based on substantial evidence, his decision to discount the opinions of Drs. Solis and Levine was, accordingly, also faulty. The ALJ also failed to afford weight to Dr. Levine's opinion as that of a specialist. For these reasons, the Court finds that the opinions of Drs. Solis and Levine are entitled to substantial, if not controlling, weight.

## CONCLUSION

The ALJ's decision denying benefits in this case is not consistent with the Social Security Administration's Ruling governing the evaluation of CFS claims, and is therefore based upon an erroneous legal standard. The Court also finds that the ALJ's conclusion that plaintiff was not entirely credible and his decision to discount the opinions of treating physicians Drs. Solis and Levine are not based on substantial evidence. For these reasons, the Commissioner's motion for judgment on the pleadings is denied, and plaintiff's cross-motion is granted. On remand, the Commissioner is directed to reconsider the evidence concerning plaintiff's CFS claim according to Social Security Ruling 99–2p.

SO ORDERED.